Affirmed, in Part, and Reversed and Remanded, in Part, and Opinion filed
July 10, 2007








 

Affirmed, in Part, and Reversed and Remanded, in Part, and
Opinion filed July 10, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-01246-CV

____________

 

WOODY K. LESIKAR, Individually and
as Trustee of the WOODROW V. LESIKAR FAMILY TRUST, Trustee of the WOODY K.
LESIKAR SPECIAL TRUST, and as Independent Executor of the WOODROW V. LESIKAR
ESTATE,
Appellant

 

V.

 

CAROLYN ANN LESIKAR MOON,
Individually and as Named Trustee of the CAROLYN ANN LESIKAR MOON SPECIAL TRUST, Appellee

 



 

On Appeal from the 149th
District Court

Brazoria County, Texas

Trial Court Cause No. 25560

 



 

O P I N I O N

Appellant, Woody K. Lesikar, Individually and as Trustee of
the Woodrow V. Lesikar Family Trust, Trustee of the Woody K. Lesikar Special
Trust, and as Independent Executor of the Woodrow V. Lesikar Estate, appeals
the trial court=s final judgment entered in favor of
appellee, Carolyn Ann Lesikar Moon, Individually and as Named Trustee of the
Carolyn Ann Moon Lesikar Special Trust.  We affirm, in part, and reverse and
remand, in part.  








                                                  Background

Woody Lesikar and Carolyn Ann Lesikar Moon are the son and
daughter of Woodrow V. Lesikar.  In January 1990, Mr. Lesikar established the
Woodrow V. Lesikar Family Trust (AFamily Trust@), naming himself
and Woody as co-trustees.  In 1991, Mr. Lesikar revoked, in writing, part of
the Family Trust.  On March 16, 1998, Mr. Lesikar amended the Family Trust,
effective as of December 31, 1997.  After the distribution of other bequests,
the Amended Family Trust provided that the remainder of the trust assets would
be divided equally between Woody and Carolyn and placed into a special trust
for each of them.  Woody would be the trustee of his special trust, while
Carolyn would be the trustee of her special trust.  Mr. Lesikar died on January
28, 2001, thereby making the Amended Family Trust irrevocable and Woody the
sole trustee of the Family Trust.  

On August 19, 2003, Carolyn filed a petition for
construction of the trust, declaratory judgment, accounting, imposition of a
constructive trust, appointment of a receiver, and injunctive relief.  Carolyn
alleged claims against Woody for breach of fiduciary duty, conversion,
negligence, civil conspiracy, and tortious interference with inheritance.  As
relevant to this appeal, Carolyn sought to compel Woody to fund and relinquish
control of her special trust.  








On July 22, 2004, Carolyn filed a motion for partial
summary judgment arguing she, not Woody, is trustee of her special trust, as a
matter of law.  Carolyn further requested that the trial court order Woody to
partition the then existing Family Trust assets, distribute her share of the
assets to her special trust, and relinquish control of her special trust to her
as trustee of her trust.  In his response to Carolyn=s motion for
partial summary judgment, Woody argued that because, in his belief, Carolyn is
unable to manage her share of the Family Trust assets, he, in his unfettered
discretion, could choose not to fund her special trust.  Woody also filed a
counter-motion for summary judgment in which he similarly argued he has
unfettered discretion in determining whether to make distributions to Carolyn=s special trust. 
On March 28, 2005, the trial court granted Carolyn=s motion for
summary judgment, finding, as a matter of law, Carolyn to be the trustee of her
special trust, and denied Woody=s counter-motion for summary judgment on
this issue.  

On November 8, 2004, the trial court, on its own motion,
appointed a special master to examine the Family Trust=s books and
records, devise a plan for the distribution of the Family Trust assets, and
prepare a report to the court.  

On May 27, 2005, Woody filed a second supplemental answer,
plea to the jurisdiction, special exceptions, and counterclaim, alleging that
Carolyn, by filing and pursuing this action, contesting the terms of the trust
declaration creating the Family Trust and the operations and distributions of
the trust, has forfeited her interest in the trust under the in terrorem clause. 
Woody also filed a motion for interlocutory summary judgment arguing that under
the in terrorem clause, Carolyn has forfeited her share of the Family
Trust by bringing this lawsuit.  Carolyn filed a motion to strike Woody=s second
supplemental answer and his motion for interlocutory summary judgment.  The
trial court did not rule on either Woody=s motion for
summary judgment or Carolyn=s motion to strike.  

On June 6, 2005, the trial court adopted, in part, the
special master=s report.[1] 
The trial court did not adopt the report with respect to an issue regarding a
$200,000 contingent fee liability, reserving that issue for trial.  On June 10,
2005, the trial court conducted a bench trial on the $200,000 contingent fee
liability issue and Carolyn=s attorney fees.  

On September 13, 2005, the trial court entered a final
judgment specifying which Trust assets are to be distributed to Woody=s and Carolyn=s special trusts
and those that are to remain in the Family Trust for distribution to other
beneficiaries.  The final judgment also awards Carolyn $400,000 in attorney
fees, after being adjusted to equalize the division of assets between Woody=s and Carolyn=s special trusts
and the Family Trust, resulting in a net attorney fee award of $273,257.  The
judgment also states Carolyn nonsuited her other causes of action still pending
in the case without prejudice to refiling.  








In this appeal, Woody argues the trial court improperly
interfered with his discretion as trustee, erred in finding Carolyn the trustee
of her special trust, erred in rejecting his in terrorem defense, erred
in adopting the special master=s report and denying him a jury trial, and
abused its discretion in awarding Carolyn $400,000 in attorney fees.

                                           Trustee=s Discretion

In his first issue, Woody claims the trial court interfered
with his discretion as trustee by ordering him to fund Carolyn=s special trust,
without a predicate finding of fraud, misconduct, or abuse of discretion. 
Carolyn asserts, under the Amended Family Trust, Woody has no discretion not to
fund her special trust.  

The court may not substitute its discretion for that of the
trustee, and may interfere with the trustee=s discretionary
powers only in the case of fraud, misconduct, or clear abuse of discretion.  Beaty
v. Bales, 677 S.W.2d 750, 754 (Tex. App.CSan Antonio 1984,
writ ref=d n.r.e.); Coffee
v. William Marsh Rice Univ., 408 S.W.2d 269, 284 (Tex. Civ. App.CHouston 1966, writ
ref=d n.r.e.); see
also Brown v. Scherck, 393 S.W.2d 172, 184 (Tex. Civ. App.CCorpus Christi
1965, no writ) (observing that appellants had not undertaken to allege or prove
the trustees had abused their discretion or acted dishonestly, in bad faith or
arbitrarily, and a court will not interfere with trustees in the exercise of a
discretionary power except where proper grounds are pleaded and proved).  Where
the trust instrument is unambiguous and expresses the intentions of the
settlor, the trustee=s powers are conferred by the instrument
and the neither the court nor the trustee can add or take away such power.  Beaty,
677 S.W.2d at 754.  

The Amended Family
Trust gives the Trustee the discretion to allocate and apportion Trust assets
in the distribution of the trust estate.  However, Carolyn maintains, upon the
death of Mr. Lesikar, the Amended Trust imposes a mandatory duty on the Trustee
to divide the trust assets into two special trustsCone for Carolyn
and one for Woody.  Section 3.6 provides, with respect to the establishment of
the special trusts:








All of the
remaining trust estate not used to establish the trusts described in Articles
3.1, 3.3, 3.4, and 3.5 above, shall be the ACumulative Total@ and shall
be divided as follows:  The Trustee shall divide the Cumulative Total in
half.  One-half (2) shall be transferred into a
separate trust for WOODY, if living, otherwise it shall be divided into equal
parts for his then living descendants, per stirpes.  One-half (2) shall be
transferred into a separate trust for CAROLYN, if living, otherwise it shall be
divided into equal parts for her then living descendants, per stirpes. . . .
Each trust shall be called by the Beneficiary=s name with the
phrase ASpecial Trust@.  Each
Beneficiary shall be the sole beneficiary of his or her trust. . . .[2]

The court interprets trust instruments as it does
contracts.  Goldin v. Bartholow, 166 F.3d 710, 715 (5th Cir. 1999).  The
court=s primary
objective in construing a will or a trust is to determine the intent of the maker. 
Hurley v. Moody Nat=l Bank of
Galveston, 98 S.W.3d 307, 310 (Tex. App.CHouston [1st
Dist.] 2003, no pet.); Myrick v. Moody, 802 S.W.2d 735, 738 (Tex. App.CHouston [14th
Dist.] 1990, writ denied).  To determine the maker=s intent, we are
limited to the four corners of the trust instrument.  Eckels v. Davis,
111 S.W.3d 687, 694 (Tex. App.CFort Worth 2003, pet. denied); Myrick,
802 S.W.2d at 738.  The court should construe the trust to give effect to all
provisions so that no provision is rendered meaningless.  Hurley, 98
S.W.3d at 310; Myrick, 802 S.W.2d at 738.  The construction of a will or
trust instrument is a question of law for the court when there is no
ambiguity.  Eckels, 111 S.W.3d at 694; Wright v. Greenburg, 2
S.W.3d 666, 671 (Tex. App.CHouston [14th Dist.] 1999, pet. denied). 
The parties do not assert on appeal, and they did not assert in the trial
court, any ambiguity in the Amended Trust.  








Common words should be given their plain meaning unless the
context indicates the words were used in another sense.  Patrick v. Patrick,
182 S.W.3d 433, 436 (Tex. App.CAustin 2005, no pet.).  The word Ashall@ as used in
contracts is generally mandatory, operating to impose a duty.  Roberts v.
Clark, 188 S.W.3d 204, 210 (Tex. App.CTyler 2002, pet.
denied) (citing Black=s Law Dictionary 1379 (7th ed.
1999)).  In common or ordinary parlance, Ashall@ is a word of Acommand, and one
which has always or must be given a compulsory meaning; as denoting obligation.@  Black=s Law Dictionary 1375 (6th ed. 1990).  It is Ainconsistent with
the concept of discretion.@  Id.  

Of the remaining assets in the Trust, the Amended Family
Trust provided A[o]ne-half (2) shall be
transferred into a separate trust for CAROLYN, if living, . . .@[3]  Under the Trust,
Woody had no discretion to do other than fund the special trusts. 
Because Woody had no discretion not to fund Carolyn=s special trust,
it was not necessary for the trial court to make of finding of fraud,
misconduct, or abuse of discretion.  Woody=s first issue is
overruled.  

                                          Ward Trust Provision

In his fourth issue, Woody asserts the trial court erred in
granting partial summary judgment in favor of Carolyn, finding, as a matter of
law, that she is the trustee of her special trust.[4] 
To prevail on a motion for summary judgment, the movant must establish that no
material fact issue exists and that she is entitled to judgment as a matter of
law.  Browning v. Prostok, 165 S.W.3d 336, 344 (Tex. 2005).  In
conducting our review of the summary judgment, we take as true all evidence
favorable to the nonmovant, and make all reasonable inferences in the nonmovant=s favor.  Diversicare
Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 846 (Tex. 2005).  

Woody argues it
was his obligation under the ward trust provision of the Amended Family Trust
not to distribute the assets to Carolyn directly because of a history of
instability in her personal life and her inability to manage her financial
affairs.  The ward trust provision states:








If any share of
any trust estate is otherwise provided to be distributed to a person who has
not attained the age of eighteen (18) years or who, regardless of age, in
the absolute and uncontrolled judgment of the Trustee, is insolvent, or
incapacitated by reason or legal incapacity or physical or mental illness, or
infirmity, o[r] unable to manage funds (such person is referred to as
the AWARD@) the Trustee
is to hold such share in a separate trust fund for the benefit of such Ward. 
When any such Ward attains the age of eighteen (18) years and when such Ward,
in the absolute and uncontrolled judgment of the Trustee, becomes legally,
financially, mentally, and physically capable of receiving and managing such
share, all remaining income shall terminate. . . .[5]


Carolyn, however,
contends, once Mr. Lesikar died, Woody had no discretion but to recognize her
as trustee of her special trust.  Section 8.2 states, in relevant part:  

Any Beneficiary of a trust created
by Article 3.6 for such Beneficiary after attaining age thirty (30), shall
supersede any then acting Trustee and become sole Trustee of such trust.[6]

As discussed above, the word Ashall@ is mandatory[7]
and is contrary with the idea of discretion.[8] 
The Trustee=s determination of a beneficiary=s ability to
manage funds is merely discretionary, while the Amended Family Trust leaves no
discretion in Carolyn=s being the trustee of her own trust. 
Allowing the discretionary language of the ward trust provision to trump the
mandatory language naming Carolyn the trustee of her own trust would alter the
plain language of the Amended Family Trust.  It was not error for the trial
court to grant Carolyn=s motion for partial summary judgment,
finding her to be trustee of her special trust.  Woody=s fourth issue is
overruled. 








In Terrorem clause

In his second issue, Woody contends the trial court erred
in awarding relief to Carolyn because her breach of fiduciary claim against him
violates the in terrorem clause in the Amended Family Trust, resulting
in the forfeiture of her interest in the Family Trust.  Woody raised the in
terrorem defense in his motion for interlocutory summary judgment, which
Carolyn asserts was filed untimely.[9] 


The agreed docket control order set the cut-off date for
hearing all dispositive motions on May 27, 2005.  The agreed docket control
order provided a preferential trial setting of June 6, 2005.  Woody filed his
motion for interlocutory summary judgment on May 27, 2005.  On June 2, 2005,
Carolyn filed a motion to strike Woody=s motion for
interlocutory summary judgment, asserting it was filed less than 21 days before
the preferential trial setting and, therefore, it was not possible to meet the
21 days= notice
requirement for a hearing on the motion.  The trial court did not rule on
either Woody=s motion for interlocutory summary judgment or Carolyn=s motion to
strike.  








Rule 166a(c) provides, in relevant part:  AExcept on leave of
court, with notice to opposing counsel, the motion and any supporting
affidavits shall be filed and served at least twenty-one days before the
time specified for hearing.@  Tex.
R. Civ. P. 166a(c) (emphasis added).  Rule 166a=s notice
requirements must be strictly construed.  Sams v. N.L. Indus., Inc., 735
S.W.2d 486, 487 (Tex. App.CHouston [1st Dist.] 1987, no writ).  The
reference in Rule 166a(c) to summary judgment hearings in the context of
timetables is to provide sufficient notice to the nonmovant to respond to the
motion and allow adequate time for the response.  Martin v. Cohen, 804
S.W.2d 201, 203 (Tex. App.CHouston [14th Dist.] 1991, no writ).  

Woody=s motion for interlocutory summary
judgment was filed ten days before the preferential trial setting.  Woody did
not request leave to file his motion for summary judgment and there is nothing
in the record to show the trial court granted Woody leave.  The trial court
would not have been able to hold a hearing on Woody=s interlocutory
motion for summary judgment because Rule 166a(c) requires 21 days= notice for a
hearing on a motion for summary judgment.  Moreover, had the trial court
granted Woody leave to file his motion for interlocutory summary judgment so
close to the date of the preferential trial setting, Carolyn would have been
entitled to a period of time in which to file a response to Woody=s motion.  See
Espeche v. Ritzell, 65 S.W.3d 226, 231 n.7 (Tex. App.CHouston [14th
Dist.] 2001), rev=d on other grounds, 87 S.W.3d 536
(Tex. 2002) (observing that had the trial court granted husband leave to file
an amended motion for summary judgment so close to the date of the hearing,
wife would have been entitled, pursuant to Rule 166a(c), to a period of time in
which to file a response to new ground presented in the amended motion); Sams,
735 S.W.2d at 488 (holding appellant was deprived of notice and hearing
requirements of Rule 166a(c) where reply to appellant=s response to
motion for summary judgment raising additional grounds for summary judgment was
filed after the trial court had heard the motion for summary judgment).  We
conclude Woody=s motion for interlocutory summary judgment was not
timely filed and the trial court properly did not consider it.[10] 









Even if Woody had timely filed his motion for interlocutory
summary judgment, we, nonetheless, conclude the in terrorem clause does
not apply to Carolyn=s breach of fiduciary duty claim against
Woody related to the sale of certain stock, known as the AAirport Stock,@ from the Family
Trust to him prior to Mr. Lesikar=s death.[11] 
In terrorem clauses allow the intent of the testator to be given full
effect and avoid vexatious litigation, often among members of the same family. 
Gunter v. Pogue, 672 S.W.2d 840, 842B43 (Tex. App.CCorpus Christi
1984, writ ref=d n.r.e.); see also Ferguson v. Ferguson, 111
S.W.3d 589, 599 (Tex. App.CFort Worth 2003, pet. denied) (stating the
purpose of the in terrorem clause is to dissuade beneficiaries from
challenging gifts made in the will).  If the intention of a suit is to thwart
the settlor=s intention, the in terrorem clause should be
enforced.  Ferguson, 111 S.W.3d at 599.  A violation of the in
terrorem clause will be found only when the acts of the parties clearly
fall within its express terms.  In re Estate of Hamill, 866 S.W.2d 339,
342B43 (Tex. App.CAmarillo 1993, no
writ).  Thus, we narrowly construe in terrorem clauses to avoid
forfeiture while also fulfilling the settlor=s intent.  McClendon
v. McClendon, 862 S.W.2d 662, 678 (Tex. App.CDallas 1993, writ
denied).  

Section 12.26, the
in terrorem clause in the Amended Family Trust, states:








It is the Settlor=s desire that
there shall be not [sic] controversy whatever among the members of his family,
or any of them concerning this Trust Agreement or the administration of the
trusts created hereunder, and in order, if possible, to prevent such
controversy, it is Settlor=s will and he hereby expressly provides
and makes it a condition precedent to the taking, vesting, receiving or
enjoying of any interest in any property or income under or by virtue of the
trusts created hereunder that no person or party hereunder shall in any manner
contest the trusts created herein or question or contest any provision or
recital herein or the operation thereof or any distributions made by the
Trustee or any actions taken by the Trustee.  Settlor hereby further directs
and provides that should any person or party so contest or question, or bring suit,
or in any manner whatever directly or indirectly aid in any such contest or
questioning, or suit, he or she shall thereupon lose and forfeit all benefits
to him or her under the provisions hereof as if the person so contesting or
questioning the trust created hereunder or aiding therein had died and such
trust of which such person was a beneficiary shall be administered as if such
person had died.  

Carolyn=s claims relate to her allegation that
Woody breached his fiduciary duty.  AThe right to
challenge a fiduciary=s actions is inherent in the
fiduciary/beneficiary relationship.@  McClendon,
862 S.W.2d at 678.  Woody argues this clause is broader than the in terrorem
clause in McClendon because it prohibits challenges to any action by
the trustee, including whether the trustee breached his fiduciary duty by
engaging in self-dealing and, therefore, McClendon is inapplicable.[12] 
We do not read McClendon in such a restrictive manner.  

Woody further suggests the trial court=s granting of his
motion for summary judgment on Carolyn=s claim for breach
of fiduciary duty against him with regard to his purchase of the Airport Stock
from the Family Trust demonstrates that she wanted to thwart Mr. Lesikar=s intention to
sell the stock to Woody while he was still alive.  The issue here is whether
Carolyn violated the in terrorem clause by raising a breach of fiduciary
duty claim against Woody, not whether she prevailed or failed on the merits of
that claim.  We conclude Carolyn=s bringing a
breach of fiduciary duty claim against Woody does not violate the in
terrorem clause and, therefore, does not result in the forfeiture of her
share of the Family Trust.  Woody=s second issue is
overruled.          








Special Master=s Report

In his third issue, Woody asserts the trial court
improperly adopted the special master=s report over his
objections and denied him a jury trial on the merits.  On November 8, 2004, the
trial court, on its own motion, appointed a special master, after examining the
books and records of the Family Trust and identifying and determining the value
of trust assets, to Adevise a plan to fairly, equitably, and
prudently divide the assets currently held by the Family Trust in accordance
with the Amended Family Trust in effect at the time of Mr. Lesikar=s death.@  The special
master was further directed to prepare a report to the trial court, which would
be provided to the parties at the court=s election.  

Carolyn argues Woody has waived any complaint with regard
to the trial court=s adoption of the special master=s report because
he failed to object to it before it was adopted.  If no proper objection is
made to the master=s report before the trial court adopts it,
the report becomes conclusive on the issues considered by the master.  Owens-Corning
Fibreglas Corp. v. Caldwell, 830 S.W.2d 622, 625 (Tex. App.CHouston [1st
Dist.] 1991, orig. proceeding); Martin v. Martin, 797 S.W.2d 347, 350
(Tex. App.CTexarkana 1990, no writ); McCrory & Co. v.
Avery Mays Constr. Co., 690 S.W.2d 333, 334 (Tex. App.CDallas 1985, writ
ref=d n.r.e.); Novotny
v. Novotny, 665 S.W.2d 171, 173 (Tex. App.CHouston [1st
Dist.] 1983, writ ref=d n.r.e.); Cameron v. Cameron, 601
S.W.2d 814, 815 (Tex. Civ. App.CDallas 1980, no writ).  It is the
dissatisfied party=s burden to make specific objections
before the report is adopted by the court.  Martin, 797 S.W.2d at 350; McCrory
& Co., 690 S.W.2d at 334; Novotny, 665 S.W.2d at 173; Cameron,
601 S.W.2d at 815.  To the extent it is challenged by exceptions, the master=s report is not
binding and the contested fact issues are to be tried de novo before the court
if a jury has not been requested, or before a jury if one has been requested.  Minnich
v. Jones, 799 S.W.2d 327, 328 (Tex. App.CTexarkana 1990,
orig. proceeding).  








In its findings of fact, the trial court states it adopted
the special master=s report on June 6, 2005, and no
objections had been made prior to its adoption.  Woody asserts that the trial court
adopted the special master=s report on June 8, 2005, not June 6,
2005, and he objected to the report before the trial court adopted it.  Woody
maintains that even if the trial court adopted the special master=s report on June
6, 2005, he still objected to it prior to its adoption.  

Woody states that
at a hearing on April 11, 2005, the trial court was aware that he was Anot real happy
with that expert report.@  However, there is nothing in the record
showing what specific objections Woody had made to the special master=s report at that
time.  Additionally, the following took place at the April 11, 2005 hearing:

THE COURT:  Okay.  Let me ask y=all a question at this point. 
Based on the summary judgment, what action is necessary to get the trust
funded?

MR. WAGNER [Carolyn=s counsel]:  Determine what should go in there.

MS. BAYLESS [Carolyn=s counsel]:  You have to partition the assets that
are remaining and that=s an equitable action.  You have to
partition those assets that go into the Moon trust and order them distributed
to the Moon trust because he=s not doing it.

MR. DENMAN [Woody=s counsel]:  Judge, I don=t think that that -- I don=t think this Court -- it=s not equitable because they=re talking about partitioning
real property and that requires appointing of commissioners and you=ve got to go through a valid
partition.  This is not something -- we=re talking about real property, and it=s not equitable.

THE COURT:  Well, I=m not sure if it=s -- if the real property -- is the title to the real
property in the trust?

MR. WAGNER [Carolyn=s counsel]:  Yes, sir.

MS. BAYLESS [Carolyn=s counsel]:  Yes.  And we=re not talking about a partition of
a tract of real property.  That=s what he=s talking about.

MR. DENMAN [Woody=s counsel]:  Well, but, Judge, to determine what assets
should go where, I think you=ve got to actually partition the real property or be
involved with the real property.








THE COURT:  But you would agree that that=s not a jury issue.

MR. DENMAN [Woody=s counsel]:  Oh, we=ll argue indefinitely.

MR. MOORE [Woody=s counsel]:  Your
Honor, there are all sorts of -- there is valuation of properties.  So,
all those are factual issues.  Those are -- the trier of facts, whoever
it=s going to be --
and we have a jury in this case -- has to decide all those issues.  There is no
-- I know of no legal authority to bifurcate -- I mean we don=t want two trials
of this lawsuit.  All these issues are tried together.[13]

Woody argued the valuation of the Trust properties was a
fact issue.  However, on June 8, 2005, Woody and Carolyn stipulated to values
of the Trust properties.  With respect to the stipulation, Woody=s counsel informed
the trial court, A[t]hose [values] will amend the Special
Master=s report.@  Woody did not
assert the division of the property was a jury issue.  To the contrary, Woody
agreed the partition of real property is not a jury issue and further argued
the partition of real property was not an equitable action for the court, but
it would have to be done through the appointment of commissioners.  

Next, Woody asserts he objected to the special master=s report in his
counterclaim, filed on May 27, 2005, in which he sought a declaratory judgment Athat he, and he
alone, as Trustee of the Family Trust, has the power to apportion and allocate
the real and personal properties of the Family Trust in distribution of the
residue of Family Trust following the death of Woodrow V. Lesikar.@  This is not a
specific objection to any finding in the special master=s report.  

Woody further
claims he objected, at the June 6, 2005 hearing before the trial court adopted
the report, that it would be improper for the court to adopt the special master=s division of the
trust property because it would interfere with the trustee=s discretion.  We
agree.  The following took place at the hearing on June 6, 2005:








THE COURT:  Here=s what you have got.  It hadn=t been objected to.  The issue is you have an
unobjected Master=s report that specifically reserved, that
wouldn=t be admissible in evidence at
trial, . . .

                                                    *       
*        *

THE COURT:  . . . I would say that perhaps a good
use of the afternoon would be, or maybe even the next day for that matter,
would be for the Court to hear either argument or maybe limited amount of
testimony before I decide to adopt the report or not. . . . But if the
report is approved by the Court then I feel like that the Defendant . . . .

                                                    *       
*        *

MR. MOORE [Woody=s counsel]:  If I may, the Court posed the question whether
or not there is a Special Master=s report what is the effect.  It is our position it does
not, for the reason that the case law we presented to the Court says, if the
trust document itself provides that upon any distribution, including
termination, that the trustee has the authority to make a partition in cash
or in kind, and this trust says that, then the trustee of the trust is the only
one that has the authority to make that distribution.

In the cases that we have cited and Plaintiffs [sic]
Counsel cited, no other cases say the Court has the authority to make an
equitable partition only if the trust document doesn=t make that provision.  

                                                    *       
*        *

MR. DENMAN [Woody=s counsel]:  Even with the Court=s ruling, if there are two trusts
from a point in time, again, what we have, we have those two trusts, have
divided ownership in the property.








What Mr. Wagner has argued for over four months, and
we have asked for authority and they assure it exists and we have not seen it,
we couldn=t find it in our briefing, is the
Court has ruled there are two trusts.  It=s now to the trustee to divide the
assets between the two trusts.  They can complain about how it=s ultimately divided up, but Mr.
Wagner keeps referring to equitable powers, and we find no cases.  Only case we
could find is if the Court looks at it and in those cases, and they do say the
reason we=re allowing in the Court to
terminate the trust and partition the assets is because the trust itself did
not provide the mechanism.  This trust did not provide for a termination.  It
just said to split it.

So, what our position is from the legal
standpoint, irregardless what Patrice=s report may or may not say, is the Court=s power is not to effectuate that
report.  But if
there is no agreement that the assets would be undivided, the trustee would
then at that point in time propose a plan, and if they felt that plan was
inequitable they could contest the plan.

THE COURT:  Why
don=t we do this:  Other
than the allocation issue whether or not it was bogus, the $200,000, we will
call it that, I will adopt for whatever benefit it does the rest of her plan
and reserve the right after hearing some testimony and/or argument on the
$200,000 issue from both sides. . . .[14]

We agree that Woody objected that the Trustee had the
authority to divide Trust assets prior to the trial court=s adoption of the
special master=s report.  However, Woody=s  objections that
the Trustee had sole authority to divide Trust assets do not advance his
argument that he was denied a jury trial when he did not believe it was a an
issue for the jury to decide. 

Woody further
maintains the trial court did not clearly adopt the special master=s report at the
June 6, 2005 hearing, but, instead, urged the parties to divide the assets by
agreement:

THE COURT:  . . .
What would be wrong with the Court saying, asking you-all, what would be a
reasonable time to come up with a proposal and, you know, we informally going
off the matrix that Ms. Ferguson put down, or come up with your own and then
letting the other side have a period of time to decide.  What would be wrong
with that?  

However, at the
June 8 hearing, the trial court stated twice that it had approved the special
master=s report with the
exception of the allocation issue:  

MR. MOORE [Woody=s counsel]:  Your Honor, there is [sic] other deficiencies.








THE COURT:  I have approved the rest of the
report.

MR. MOORE [Woody=s counsel]: We understood the Court to say if there were
serious problems shown today about the allocation that would open up the entire
report.

THE COURT:  No.  I didn=t say that, sir.  I
have approved everything except the portion about -- . . .  

On June 8, 2005, prior to the start of the hearing, Woody
filed written objections to the special master=s report,
objecting to the valuations, adjustments, and proposed division of the Trust
estate contained in the special master=s report. 
Therefore, according to Woody, because the trial court did not adopt the
special master=s report until at least June 8, 2005, his objections
to the report were timely.  To the contrary, as observed above, the trial court
stated on June 8 that it had already adopted the master=s report in part.

Even if Woody=s June 8
objections had been timely, they were not sufficient to preserve error.  Woody=s objections
state, in relevant part:  

On March 18, 2005, counsel for Defendant stated in
open court at [a] hearing held in this matter that Defendant questioned the
determination and valuations made in the report.  Further, at [a] hearing held
in this matter on April 11, 2005, counsel for the Defendant reiterated to the
Court that fact issues regarding division of the trust estate and valuation of
assets were remaining fact issues to be tried.  Exhibit A - transcript of April
11, 2005 hearing, page 64.

                                                            III.

Defendant reasserts his objection to the valuations,
adjustments and proposed division of the trust estate contained in the Report
of the Special Master.

WHEREFORE,
Defendant requests that the Court grant Defendant an evidentiary hearing on the
contested portions of the Special Master=s Report and
further that the Court deny division of the trust based upon said Report.








Woody=s complaint about the valuations of the
Trust property was resolved when he entered into a stipulation regarding those
valuations.  Woody=s complaint about the division of the
Trust estate is a general, not specific, objection, and, moreover, the special
master=s report is not
included in the appellate record so we do not know what the objectionable
recommended division was.  With regard to Woody=s reference to the
April 11, 2005 hearing, Woody did not object to the proposed division in the
special master=s report at that hearing, but, instead, agreed it was
not a jury issue.  Additionally, with regard to Woody=s reference to a
hearing that took place on March 18, 2005, we do not have a record of that
hearing and cannot review what his objections may have been.  

We conclude the record supports the trial court=s finding that it
adopted the special master=s report on June 6, 2005, and Woody=s June 8
objections to the report were not timely.  Appellant=s third issue is
overruled.  

                                                 Attorney Fees

In his fifth issue, Woody claims the evidence is legally
insufficient to support the trial court=s finding that
$400,000 was a reasonable and necessary attorney fee under Section 37.009 of
the Texas Civil Practice and Remedies Code (ADeclaratory
Judgments Act@)[15]
and Section 114.064 of the Texas Property Code.[16] 
In its findings of fact, the trial court found a reasonable, necessary, and
customary fee for Carolyn=s attorneys is $400,000.  In its
conclusions of law, the trial court determined Carolyn is entitled to recover
attorney fees under the Declaratory Judgments Act and the Texas Property Code. 









The grant or denial of attorney fees under both the
Declaratory Judgments Act and the Property Code lies within the discretion of
the trial court, and its judgment will not be reversed on appeal absent a clear
showing it abused that discretion.  Oake v. Collin County, 692 S.W.2d
454, 455 (Tex. 1985); Lyco Acquisition 1984 Ltd. P=ship v. First Nat=l Bank of Amarillo, 860 S.W.2d 117,
121 (Tex. App.CAmarillo 1993, writ denied).  The trial court abuses
its discretion when it reaches a decision so arbitrary and unreasonable as to
amount to a clear and prejudicial error of law.  Joe v. Two Thirty Nine
Joint Venture, 145 S.W.3d 150, 161 (Tex. 2004).  There is no abuse,
however, simply because a trial court may decide a matter within its discretion
differently than an appellate court.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 242 (Tex.1985). 

Under an abuse of discretion standard, legal and factual
sufficiency of the evidence are relevant factors in assessing whether the trial
court abused its discretion.  Beaumont Bank, N.A. v. Buller, 806 S.W.2d
223, 226 (Tex.1991).  We review the trial court=s findings of fact
for legal and factual sufficiency of the evidence by the same standards applied
in reviewing the evidence supporting a jury=s finding.  Catalina
v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994).  When reviewing the legal
sufficiency of the evidence, we review the evidence in the light most favorable
to the challenged finding and indulge every reasonable inference that would
support it.  City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). 
We credit favorable evidence if a reasonable fact finder could, and disregard
contrary evidence unless a reasonable fact finder could not.  Id. at
827.  The evidence is legally sufficient if it would enable fair-minded people
to reach the verdict under review.  Id.  

Under both the Declaratory Judgments Act and the Texas
Property Code, the trial court may award reasonable and necessary attorney fees
as are equitable and just.  Tex. Civ.
Prac. & Rem. Code Ann. ' 37.009; Tex. Prop. Code Ann. ' 114.064.  Whether
attorney fees are reasonable and necessary are fact questions to be determined
by the fact finder.  Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W.3d 143,
161 (Tex. 2004); Hachar v. Harchar, 153 S.W.3d 138, 142 (Tex. App.CSan Antonio 2004,
no pet.).  Whether attorney fees are equitable and just are questions of law
for the court to decide.  Ridge Oil Co., 148 S.W.3d at 161; Harchar,
153 S.W.3d at 142.  AUnreasonable fees cannot be awarded, even
if the court believed them just, but the court may conclude that it is not
equitable or just to award even reasonable and necessary fees.@  Bocquet v.
Herring, 972 S.W.2d 19, 21 (Tex. 1998); Hachar, 153 S.W.3d at 142.  








The Texas Supreme Court has set forth eight factors for
determining the reasonableness and necessity for attorney fees: (1) the time
and labor involved, the novelty and difficulty of the questions involved, and
the skill required to perform the legal services properly; (2) the likelihood
that the acceptance of the particular employment will preclude other employment
by the lawyer; (3) the fee customarily charged in the locality for similar
legal services; (4) the amount involved and the results obtained; (5) the time
limitations imposed by the client or the circumstances; (6) the nature and
length of the professional relationship with the client; (7) the experience,
reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty
of collection before the legal services have been rendered.  Arthur Andersen
& Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997).  

Woody stipulated to the qualifications of Carolyn=s attorneys,
Bobbie Bayless, Brett Wagner, and Vaughn Stewart.  Bayless, whose practice has
always been Acommercial/civil litigation,@ has been licensed
since 1980, and is board certified in civil trial law.  Bayless has practiced
in Brazoria County in cases other than this case and believes she has sufficient
familiarity with rates charged in Brazoria County to provide this testimony. 
Bayless stated her hourly rate is $300, which she opined is a reasonably hourly
rate based on her years= of practice and qualifications in Harris
and Brazoria Counties.  She did not think the hourly rate is significantly
different between Harris and Brazoria Counties.  Bayless did not know Wagner=s or Stewart=s hourly rates,
but opined that $300 is also a reasonable hourly rate for both Wagner and
Stewart.  








Bayless testified she, Wagner, and Stewart spent a total of
2,500 hours on this case.  Based on an hourly fee of $300 for each of three
attorneys for 2,500 spent on this case, the total fee would be $750,000. 
However, Bayless opined a reasonable fee would be $500,000.  Bayless further
reduced that amount to $400,000 (based on 1,333 hours) by excluding time spent
on the proceedings involving Carolyn=s challenge to the
sale of the Airport Stock to Woody.  Bayless testified she has a 40%
contingency fee contract with Carolyn.  It is estimated Carolyn=s half the of the
residue of the Family Trust is $1,000,000, resulting in a $400,000 fee to
Carolyn=s attorneys under
the contingency fee contract.  Bayless, however, explained she was testifying
about a reasonable fee.[17] 


Bayless stated she has kept only some time records in this
case, but she did not produce them at trial, and she was not aware of Wagner=s or Stewart=s having kept time
records.  In spite of there being no time records, Bayless explained her belief
that at least 2,500 hours have been spent on this case is based on her
familiarity with the case and the work that has been done.  She estimated
Stewart=s and Wagner=s time spent on
the case from the work she knows they have done and from her experience knowing
the amount of work necessary to a case.  








Bayless was not able break down in detail how much time was
spent attending each hearing or preparing each pleading, but, instead, she
broke down the hours Carolyn=s attorneys spent on larger aspects of the
case.  Bayless testified that when Carolyn came to her, there had been a
proceeding in Harris County in which Woody had asserted Carolyn had violated
the no-contest clause by seeking an accounting.  Bayless stated there were 100
hours of pre-suit investigation regarding Carolyn=s request for an
accounting, which had been requested, but not given.  Between 50 and 75 hours
were expended on determining causes of action and remedies, drafting initial
pleadings, and attending a TRO hearing.  Carolyn=s attorneys spent
at least 200 hours on discovery requests, hearings on discovery requests, and
requests for living expenses for Carolyn.  Bayless stated she spent at least
350 hours going through documents produced by Woody and follow-up with Woody=s attorneys about
what documents had been requested, but were not among the documents produced to
Carolyn.  Bayless testified 350 hours were spent on research and preparation of
Carolyn=s motion for
summary judgment on the trustee issue and the hearing on the that motion. 
Bayless further stated between 50 and 75 hours were spent on meeting with the
special master and gathering and providing documents to the special master, and
between 100 and 150 hours, including performing research and attending
hearings, were expended on the case after the special master had filed her
report.  Finally, the total amount of time spent for preparation for trial and
attending seven days of trial was 600 hours.  

The trial court observed that, according to Bayless= testimony, the
total amount of time expended by Carolyn=s attorneys was Acloser to 2,000@ hours, rather
than the initial 2,500-hour figure.  However, Bayless had already agreed to
reduce the amount of time on which she based their request for attorney fees to
about 1,300 hours.  

One of Woody=s trial attorneys,
William Denman, testified in his opinion, real estate, probate, and trust
litigators do not charge more than $250 an hour in Brazoria County.  Denman
also opined it is not reasonable for three lawyers to charge a total of $900 an
hour to prepare and present this case at trial; instead, a case this size would
require two attorneys at a total of $500 an hour.  Time records reflect that
Woody=s attorneys have
spent 700 hours on this case.  Denman testified it is unusual to have plaintiff=s counsel spend
more hours on a case than defense counsel.  It was stipulated that Woody=s attorney fees
were $153,000.  Denman also stated the only novel issue of law was related to
the in terrorem clause, while the other issues were standard real estate
and trust issues.  

Carolyn asserts a trial court does not abuse its discretion
when the attorney testifies that the fees incurred were reasonable and necessary
and summarizes the hours and rate charged.  In support of this proposition,
Carolyn relies on London v. London, in which we stated, A[t]here is no
abuse of discretion where an award of attorney fees is supported by the
evidence,@ and the cases cited in that same footnote.  94 S.W.3d
139, 147 n.3 (Tex. App.CHouston [14th Dist.] 2002, no pet). 
Carolyn=s reliance on London
is misplaced.  The cases cited in London involved attorney fee awards
that were supported by time records or testimony as to specific hours expended.[18] 









Here, Bayless had no knowledge of Wagner=s or Stewart=s hourly rates. 
Although Woody stipulated to Wagner=s and Stewart=s qualifications,
Bayless did not testify as to their experience justifying the $300 hourly rate
for each of them.  Bayless kept some time records, but she did not bring them
to the trial.  She was not aware of any time records kept by Wagner or Stewart. 
Bayless gave rough estimates of the amount of time spent by her, Wagner, and
Stewart on general, but not specific, aspects of the case.  

Carolyn further claims the trial court knew the amount of
work the case required.  However, the trial court may not take judicial notice
of the attorney fees under section 37.009.  See Dickey v. McComb Dev. Co.,
115 S.W.3d 42, 46 (Tex. App.CSan Antonio 2003, no pet.) (holding that
when a claim for fees does not fall under Section 38.001 of the Texas Civil
Practice and Remedies Codes, the trial court may not take judicial notice of
attorney fees).  








Moreover, while Bayless testified she was segregating the
amount of time spent on the challenge to the sale of the Airport Stock to
Woody, she provided no testimony that she was segregating time spent on Carolyn=s other tort
claims, i.e., breach of fiduciary duty (not related to sale of Airport Stock),
negligence, interference with inheritance, conversion, and civil conspiracy,
which she nonsuited and for which attorney fees may not be recovered,[19]
from the trustee issue.  When the plaintiff seeks to recover attorney fees in a
case involving multiple claims, at least one of which supports an award of fees
and at least one of which does not, the plaintiff must offer evidence
segregating attorney fees among various claims.  Stewart Title Guar. Co. v.
Sterling, 822 S.W.2d 1, 10B11 (Tex. 1991), holding modified by
Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299 (Tex. 2006).  There is
an exception to the segregation rule:  Awhen discrete
legal services advance both a recoverable and unrecoverable claim that they are
so intertwined that they need not be segregated.@  Chapa,
212 S.W.3d at 313B14.  Carolyn offered no evidence that
segregation was not necessary. Woody=s fifth issue is
sustained.  

An award of attorney fees based on unsegregated fees
requires a remand.  Chapa, 212 S.W.3d at 314; Sterling Title Guar.
Co., 822 S.W.2d at 11.  We reverse that portion of the judgment awarding
Carolyn attorney fees and remand it to the trial court for proceedings
consistent with this opinion.  The remainder of the judgment is affirmed.  

Accordingly, the judgment of the trial court is affirmed,
in part, and reversed and remanded, in part.

 

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered
and Opinion filed July 10, 2007.

Panel consists of
Justices Yates, Anderson, and Hudson.









[1]  As discussed below, Woody disputes June 6, 2005 as
the date the trial court adopted the special master=s report, arguing the trial court did not adopt the
special master=s report until June 8, 2005.  





[2]  Emphasis added.  





[3]  Emphasis added.  





[4]  Woody does not assert that the trial court erred in
denying his counter-motion for interlocutory summary judgment on this issue.  





[5]  Emphasis added.  





[6]  Emphasis added.  





[7]  Roberts, 188 S.W.3d at 210 (citing Black=s Law Dictionary 1379).  





[8]  Black=s
Law Dictionary 1375.  





[9]  Woody also raised his in terrorem defense in
his second supplemental answer, which Carolyn asserts was filed untimely, after
the docket control order=s cut-off date the for filing amended pleadings. 
Woody asserts his in terrorem defense was properly before the court
because Carolyn had already put it in issue by asking the court, in her
petition, to construe it.  See Phillips v. Phillips, 820 S.W.2d 785, 789
(Tex. 1991) (quoting Raney v. White, 267 S.W.2d 199, 200 (Tex. Civ. AppCSan Antonio 1954, writ ref=d)) (A>When a
plaintiff in his pleadings anticipates defensive matters and pleads them, a
defendant may rely upon the defenses though his only pleading is a general
denial.=@).  However, as discussed below, Woody=s interlocutory motion for summary judgment was not timely
filed and Carolyn=s breach of fiduciary duty claim did not violate the in
terrorem clause.  





[10]  Woody contends the trial court considered his in
terrorem defense by denying his counterclaim on the merits in the final
judgment.  However, Woody=s counterclaim  asserts that he alone had authority to
apportion and allocate trust assets:

By way of counterclaim in the event that the Court orders a
distribution of the assets of the Family Trust, Defendant seeks as affirmative
relief a declaratory judgment that he, and he alone, as Trustee of the Family
Trust, has the power to apportion and allocate the real and personal properties
of the Family Trust in distribution of the residue of the Family Trust
following the death of Woodrow V. Lesikar.

Thus, Woody=s in
terrorem claim was not included in his counterclaim and it does not appear
that the trial court considered it.  Indeed, with respect to Woody=s in terrorem defense, the trial court stated, AI think it=s
too late to raise that issue.@  





[11]  Carolyn=s
breach of fiduciary claim against Woody for his purchase of the Airport Stock
from the Family Trust is not part of this appeal.  In an order dated April 11,
2005, and a nunc pro tunc order dated September 13, 2005, the trial court
severed all issues related to the sale of the Airport Stock.  





[12]  Woody had previously stated in his response to
Carolyn=s motion for partial summary judgment that he was not
invoking the in terrorem clause:

 

[Mr.
Lesikar] even provided that if Carolyn (or anyone else) contested the
directions he gave in the trust they would forfeit their beneficial interest. 
Defendant has not attempted to invoke the clause in the Family Trust because he
believes Carolyn is entitled to her rightful share.





[13]  Emphasis added.





[14]  Emphasis added.





[15]  Tex. Civ.
Prac. & Rem Code Ann. '
37.009 (Vernon 1997).





[16]  Tex. Prop.
Code Ann. ' 114.064 (Vernon 2007).





[17]  A party=s
contingent fee contract alone cannot support an award of attorney fees, but,
instead, is a factor to be considered by the fact finder.  Arthur Andersen
& Co, 945 S.W.2d at 818.  A party must prove the amount of fees
incurred was both reasonable and necessary to the prosecution of the case.  Id.
at 818B19. 





[18]  See, e.g., Farish v. Farish, 921 S.W.2d 538,
546 (Tex. App.CBeaumont 1996, no writ) (finding stipulation by
appellant=s counsel as to appellee=s qualifications and reasonableness of hourly fee and appellee=s submission to trial court of itemized statements
sufficient to support award of attorney fees); Thomas v. Thomas, 895
S.W.2d 895, 898 (Tex. App.CWaco 1995, writ
denied) (finding no abuse of discretion in award of attorney fees based on
attorney=s testimony regarding specific number of hours
spent on motion to modify child support order and hourly rate charged); Cohen
v. Sims, 830 S.W.2d 285, 290 (Tex. AppCHouston
[14th Dist.] 1992, writ denied) (finding award of attorney fees was not abuse
of discretion where attorney testified as to usual and customary fees charged
in modification action, specific number of hours expended, and hourly
rate); Coke v. Coke, 802 S.W.2d 270, 278 (Tex. App.CDallas 1990, writ denied) (finding testimony of
attorney=s qualifications, number of hours expended, hourly
rate, and summary of services rendered sufficient to support award of
attorney fees); MacCallum v. MacCallum, 801 S.W.2d 579, 587 (Tex. App.CCorpus Christi 1990, writ denied) (finding evidence
supporting attorney fees was specific, including testimony regarding
experience and hourly rate, and testimony that services were related to hearing
and necessary to case); Laviage v. Laviage, 647 S.W.2d 758, 761 (Tex.
App.CTyler 1983, no writ) (finding evidence of counsel=s hourly rate, credentials, and expertise in family
law, and records kept, prepared, and processed supported award of
attorney fees).  





[19]  See Metropolitan Life Ins. Co. v. Haney, 987
S.W.2d 236, 243B44 (Tex. App.CHouston
[14th Dist.] 1999, pet. denied) (stating attorney fees are not recoverable on
tort claims); Villasenior v. Villasenior, 911 S.W.2d 411, 420 (Tex. App.CSan Antonio 1995, no writ) (same).